1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                    SAN JOSE DIVISION

10

11   Richard Quilopras,                    NO. C 02-02927 JW

12              Petitioner,                **ORDER DENYING PETITION FOR WRIT**
                                           **OF HABEAS CORPUS**
13        v.

    Don Horsley, et al.,
14
              Respondents.
15   _____/

16                       **I.  INTRODUCTION**

17        This matter is now before the Court for consideration of Richard Quilopras' ("Petitioner")

18   Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 concerning his 1999 conviction in San

19   Mateo County Superior Court.  For the reasons discussed below, the Petition is DENIED as to all

20   claims.

21                       **II.  BACKGROUND**

22   **A.     Case History**

23        On May 6, 1999, a jury found Petitioner guilty of first-degree murder pursuant to Penal Code

24   § 187.[1]  Petitioner was sentenced to an indeterminate life sentence.[2]  On December 14, 2001, the

25   _____

26        [1]  (Amended Petition for Writ of Habeas Corpus at 1, hereafter, "Petition," Docket Item No.
27   25.)

28        [2]  (Answer to Petition for Writ of Habeas Corpus at 1, hereafter, "Answer," Docket Item No.
     29.)

United States District Court
For the Northern District of California

California Court of Appeals affirmed Petitioner's conviction and denied habeas relief.[3]  On March 20, 2002, the California Supreme Court denied his petition for appellate review and for habeas corpus.  (Answer at 1.)  On June 18, 2002, Petitioner filed this Petition for a writ of habeas corpus in federal court.  (See Docket Item No. 1.)  Petitioner raises three challenges to his conviction: (1) improper inclusion of evidence based on *Miranda* violations; (2) improper exclusion of evidence based on *Brady* violations; and (3) ineffective assistance of counsel.

**B.   Facts**

In 1976, Petitioner was hired by podiatrist Dr. William Moalem to kill his business partner, podiatrist Dr. Benjamin Hurwitz (the "Victim").  (Appeal at 3.)  Dr. Moalem had practiced for fifteen to twenty years and owned practices in San Mateo and San Francisco.  (Id. at 2.)  The Victim was in the process of purchasing Dr. Moalem's San Mateo practice when he became displeased that income from the practice was lower than Dr. Moalem had promised.  (Id. at 1-2.)  Dr. Moalem also complained that the Victim owed him money.  (Id. at 2.)  For these reasons, they renegotiated their agreement so that the Victim would buy half of the building in which the San Mateo practice was housed.  (Id.)  Part of the agreement was that the two would take out life insurance policies payable to one another.  (Id.)  This agreement was really a front for Dr. Moalem's plan to have the Victim killed in order to cash in his life insurance.  (Id.)

Around December 1975, Dr. Moalem's finances were strained, so he explained to his wife a plan to turn their finances around.  (Appeal at 2.)  The plan was to sell a portion of the San Mateo building to the Victim, with part of the agreement being to take out a $60,000 life insurance policy on the Victim through Transamerica Insurance Company.  (Id.)  Sidney Cooper ("Cooper") handled the insurance policy.  (Id.)  Dr. Moalem's intent was to have the Victim killed for the life insurance policy, waiting a minimum of six to nine months to avoid suspicion, and paying the premium on the life insurance policy.  (Id.)  The murder was to be arranged by Cooper because of his contacts.  (Id.)

---

[3]  (See Amended Petition for Writ of Habeas Corpus, Ex. A, State Appeals Court Opinion Affirming Conviction No. A091926, hereafter, "Appeal," Docket Item No. 25.)

**United States District Court**
For the Northern District of California

Cooper had known Petitioner for seven to nine years and knew he had done some "strong-arming" and collections.  (Appeal at 3.)  In mid-August 1976, Cooper went to Petitioner's home in Daly City and asked whether he would be willing to kill someone.  (Id.)  Petitioner said he would kill someone for $6,000.  (Id.)  Cooper related this figure to Dr. Moalem, who agreed to pay it.  (Id.)  Cooper then gave Petitioner the Victim's name and office address, and Dr. Moalem's name and phone number.  (Id.)  Petitioner then scheduled an appointment with the Victim for August 26, 1976 to look the area over.  (Id.)

Petitioner contacted his friend of twenty-five years, Dennis Agan ("Agan") to request that he "drive for a hit" for $1,000.  (Appeal at 4.)  Agan agreed to do this, as he and Petitioner were friends that got together three or four times a week to drink and do drugs, as well as deal drugs, at each of their residences and at the Country Roads bar where Petitioner worked as a doorman.  (Id.)  Petitioner would supply the drugs and they would use cocaine, marijuana, Quaaludes, angel dust, heroin, or whatever was around.  (Id.)  Agan had a reputation as a good driver, even when he was on drugs.  (Id.)

On September 20, 1976, the Victim and his daughter went out for dinner and visited Dr. Moalem's wife Tania.  (Appeal at 3.)  The Victim dropped his daughter off in the early evening.  As he drove on Highway 92, someone shot at him but missed, hitting his car door a few inches below the window.  (Id.)  The Victim went to a nearby police station and told a sergeant there that he was driving along when he heard a sudden bang.  (Id.)  The Victim stated he did not know anyone who would try to shoot him.  (Id.)

The next day, Petitioner failed to show up for a second appointment he had with the Victim.  (Appeal at 4.)  Petitioner went to Cooper's office and told him he missed.  (Id.)

After the failed attempt to kill the Victim, Dr. Moalem asked his wife Tania to be nice to the Victim and to reassure him, because he was afraid.  (Appeal at 4.)  On October 13, 1976, Dr. Moalem told Tania that another attempt would be made to kill the Victim.  (Id.)  He said he would meet the Victim at a hospital staff meeting in San Francisco and that on the way home he would take

**United States District Court**
For the Northern District of California

Highway 280, but the Victim would take Highway 101, so that they would not be in the same location. (Id.)

On October 13, 1976, Petitioner and Agan met in the Country Roads parking lot and smoked a joint. (Appeal at 4.) Agan got in the driver's seat of Petitioner's red Toyota and they sat there for a bit. (Id.) A third man, Robert Newman ("Newman"), walked up and they passed the joint to him. (Id.) Newman asked what they were doing. (Id. at 5.) Petitioner said they were waiting to take a ride, and Newman got in the car. (Id.) They then drove to the Victim's office. (Id.) The light was still on, so they parked in a nearby alley and waited for the Victim to leave. (Id.) Fifteen minutes passed before the Victim came out and got in his car. (Id.) Petitioner and the others followed the Victim onto Highway 92, where Petitioner shot the Victim with a rifle as they were driving. (Id.) Agan watch the Victim's car in his rear view mirror as it went off the road over a mound and some bushes. (Id.) Newman said, "we got him," and Petitioner "high-fived" everyone. (Id.)

Agan then drove down an access road in Burlingame to a place designated by Petitioner. (Appeal at 5.) Newman stood lookout about 25 feet from the car to assure that no cars were coming. Petitioner got out of the car, tried to break the rifle and then threw it in the water. (Id.) Petitioner said, at this point or earlier, "If anything happens, I got my ass covered, and Sidney Cooper has got your picture." (Id.) To which Agan responded, "That was really fucked," and that if a bullet is coming, "I don't want to see it coming." (Id.)

At 9:26 pm, Foster City Police Officer Tom Allen was dispatched to the scene of a possible injury accident at Highway 92 and Marina Drive. (Appeal at 6.) He observed the Victim's green and brown Ford station wagon with its front wheels in a culvert or ditch. (Id.) Firefighters were administering CPR to the Victim who had a large wound in the neck. (Id.) The Victim had no pulse and was not breathing. (Id.) An autopsy revealed that the Victim died of a gunshot wound to the neck. (Id.) The bullet was shot from a 30-30, 30-06 or .308-caliber rifle which was more than three feet away, entered the left side of the neck, passed through horizontally, and exited the right side. (Id.)

United States District Court

For the Northern District of California

The morning after the shooting, Dr. Moalem told his wife that the Victim had been killed in what was made to look like a drive-by shooting. (Appeal at 6.) On October 15, 1976, Dr. Moalem instructed Tania to go to the Russian American Credit Union and get some money for the balance due the shooter. (Id.) She deposited $4,650 and then withdrew $3,000. (Id.)

On October 15, 1976, Cooper read in the newspaper that the Victim had been shot. (Appeal at 6.) The next morning, Petitioner called and said he wanted to come down and get his money. (Id.) Cooper called Dr. Moalem and relayed the message. (Id.) Dr. Moalem said he would have the money in three or four hours. (Id.) Cooper told Petitioner to come to his office at 1:00 pm. (Id.) When Petitioner arrived, he and Cooper drove to Tenth and Clement in San Francisco, about a block from Dr. Moalem's office. (Id. at 7.) Petitioner stayed in the car; Cooper got out of the car and met Dr. Moalem, who gave him a paper bag. (Id.) Cooper got back in his car and gave the bag to Petitioner. Petitioner looked in the bag and said he was leaving for Hawaii. (Id.) Cooper did not see him again for six or seven years. (Id.)

Petitioner's brother, Michael Quilopras, shared a house with Petitioner in 1976. (Appeal at 7.) Their father stayed with them on weekends in Petitioner's room. (Id.) Their father owned a 30.06 rifle with a scope, which he stored in the closet there. (Id.) Two months after Petitioner left for Hawaii, Michael noticed that $1,500 and the rifle were missing. (Id.) He noticed that the rifle had been gone since the time Petitioner went to Hawaii. (Id.)

On January 9, 1995, Tania Moalem consulted attorney Doron Weinberg. (Appeal at 7.) She told him her husband was responsible for the murder of his business partner and that she was afraid of him. (Id.) Later that year, Tania confided in her close friend that she was afraid that Dr. Moalem was going to kill her. (Id.) She said he had hired someone to do it before. (Id.) In spring of 1996, Tania mentioned the subject to her friend again, stating that her husband had arranged to have his business partner killed. (Id.)

In April 1998, Robin Krane, Tania's divorce attorney, accompanied Tania to her safety deposit box, where she showed a document to the attorney. (Id.) The document expressed to Tania's brother that in the event of her death he should be suspicious of William Moalem, of whom

5

United States District Court
For the Northern District of California

1  she was fearful, because he had had his business partner Benny killed.  (Id.)  The document went on

2  to say that in particular, Dr. Moalem had hired a killer through Sidney Cooper.  (Id.)  Further, Tania

3  told Ms. Krane that Dr. Moalem had threatened to kill her.  (Id.)  Tania destroyed the letter against

4  her attorney's advice.  (Id.)

5       On August 12, 1999, Detective Steven Archer ("Archer") arrested Petitioner at his home.

6  (Appeal at 8.)  Archer handcuffed Petitioner, advised him he was in custody, and read him his

7  Miranda rights from a card.[4]  (Id.)  Petitioner stated that he understood his rights.  (Id.)  He was

8  taken to the Foster City police station and interviewed for about two hours by Archer and Inspector

9  Kat Colson ("Colson") of the district attorney's office.  (Id.)  In that interview, Petitioner denied

10 being in the car from which the fatal shot was fired, but admitted that he was involved in the murder

11 of the Victim, in that he was the middle man who received the money from Cooper and delivered it

12 to two other men, Dennis and Jeffrey, who did the driving and shooting.  (Id.)

13      On August 13, 1999, Archer and Colson interviewed appellant again.  (Appeal at 8.)  Archer

14 advised Petitioner of his Miranda rights and Petitioner indicated that he understood.  (Id.)  About a

15 minute later, after Archer complied with Petitioner's request that he turn off the tape recorder

16 (Petitioner was unaware that the interview was being videotaped), Archer said, "You know, if you

17 want to, we'll get up and leave and will call you an attorney.  It isn't going to change where you are

18 at.  Okay?  You'll still be here.  There will still be a massive case against you."  (Id. at 9.)

19      Petitioner continued to take the position that Dennis was the driver and Jeffrey the shooter.

20 (Appeal at 9.)  Archer told Petitioner he could not find any record of a Dennis Haygen or Huygen,

21 and asked him to confirm the spelling of the name.  (Id.)  Petitioner said he had not seen him for

22 twelve or fifteen years.  (Id.)

23      Petitioner described his involvement in the conspiracy as follows:

24 _____

25      [4]  The card read: "You have the right to remain silent.  Anything you say can and will be used against you in a court of law. [¶] You have the right to talk to a lawyer and to have him present

26 with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning, if you wish. [¶] You can decide at any time to

27 exercise these rights and not answer any questions or make any statements. [¶] Do you understand each of these rights as I have explained them to you?"  (Id. at 8, n.5)

28

[Cooper] came to me and told me that, ah, he wanted a, he had a doctor friend that, ah, um, had a partner that he wanted to, that he wanted to have his partner, ah, eliminated. And, ah, if, ah, I was interested in taking the job or if I knew anybody. And I told him I wasn't interested but I might know somebody that would be. And, um, I asked him how much, he told me six. I told him they wanted front money and, ah, we discussed that. When it happened, they would get paid that same day or the next day that, ah, we discussed that. When it happened, they would get paid that same day or the next day that, ah, they did it so they wouldn't have to go see him again. He was able to come up with the $2,000 cash. . . .

(Appeal at 9.)

Petitioner said the plan to shoot the Victim on the freeway was made by Jeff (since deceased) and Dennis, the shooter and the driver, not by himself or Dr. Moalem. (Appeal at 9.) He described the failed attempt to kill the Victim on the freeway, stating Jeff and Dennis followed the Victim in a red Toyota and that he followed them in a separate car and observed the attempt as well as the Victim's driving to the police station. (Id.) Petitioner denied being present at the fatal shooting, because he was "tired of just waiting." (Id.)

At the close of this interview, Petitioner agreed that the officer had read him his rights before both interviews and that he talked with them voluntarily. (Appeal at 9.)

On August 14, 1999, Archer and Colson interviewed Petitioner a third time. (Appeal at 10.) Archer reminded Petitioner, "Okay you remember when I read your rights off the card [before the tape recorder got here]?" (Id.) Petitioner said yes. (Id.) Archer said he did not believe the "Dennis part" of Petitioner's story, that is Dennis being the driver, because he search had revealed no one named Dennis Hagan, although he had found a Dennis Agan who had hung out at Petitioner's bar. (Id.) Petitioner said that the driver was not Dennis Agan. (Id.) At that point, Archer said he wanted to clear up a few points, but first he reminded Petitioner of his right to have an attorney, and Petitioner again stated he chose to talk without an attorney present. (Id.) Archer proceeded to go over Petitioner's story point by point. (Id.) A few moments into it, Archer said Petitioner seemed angry and upset and that perhaps they should terminate the interview. (Id.) Instead, Petitioner said no, and added, "I tell you everything, every time." (Id.)

After further discussion, Archer said he had only thirty minutes more to talk to Petitioner. (Appeal at 10.) Petitioner asked why, and Archer said, "because you're going to go up to

arraignment and they're going to give you an attorney." (Id.) Petitioner replied, "they're not going to give me, I'm going, I'm going, like I told [Colson] yesterday, I'm going to deny the attorney. I don't want a court appointed attorney, okay? [¶] . . . [¶] So I won't have an attorney so you can't say you can't talk to me anymore because I won't have an attorney until I hire my own." (Id.)

Petitioner again reiterated his story. (Appeal at 10.) He described three unsuccessful efforts, including the two shootings by Jeff and Dennis to kill the Victim, and insisted that he was at home the night of the second (fatal) shooting. (Id.)

Agan was arrested on February 9, 1999, for the murder of Dr. Hurwitz; he was released 18 hours later. Agan entered into a plea agreement whereby he pled guilty to second degree murder of Dr. Hurwitz, and to a 1985 assault with intent to commit murder, and agreed to testify truthfully in this case. Agan testified that he knew Petitioner, whose nickname was "Kilo," for 25 years.[5]

At trial, the defense called Peter Keane, an attorney, former chief assistant public defender, certified criminal law specialist, and Dean of Golden Gate University School of Law, who testified for the defense as a criminal law expert about Agan's immunity agreement. (Appeal at 10-11.) He stated that Agan was facing two consecutive prison terms of seven years to life for first degree murder and for conspiracy to commit murder of the Victim. (Id. at 11.) Agan was also charged with a murder he committed in 1985, for which he was facing a possible death sentence. (Id.) If Agan did not carry out his agreement, he could be prosecuted for the 1976 and 1985 crimes and receive all three sentences. (Id.)

The document entitled "Agreement to Provide Truthful Testimony," was prepared by the district attorney. (Appeal at 11.) Keane testified that in the context of that agreement, "truth" meant "that Mr. Agan . . . has to go ahead and say what he said in his interview with the police and the district attorney about the way these crimes happened. [¶] And if he does not testify in that fashion, according to what he has told them occurred, then that would be considered his not telling the truth and his bargain would be off." (Id.)

---

[5] Petitioner explained during his confession that a ninth grade teacher who could not pronounce his last name shortened it to "Quilo," and that became his nickname.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    The People called Martin Murray, an assistant district attorney and an expert in the law of

2    homicide, in rebuttal.  (Appeal at 11.)  He testified that Agan was obligated to tell the truth to the

3    police and in his testimony.  (Id.)  If the district attorney thought Agan breached the agreement, he

4    could reinstate murder charges against him, but ultimately the determination would be made by a

5    judge.  (Id.)  He could not, however, be punished for both the conspiracy to commit murder and the

6    murder of the Victim under section 654 of the Penal Code.  (Id.)

7    Richard Mason, a forensic pathologist, was called by the defense as an expert in wound

8    ballistics.  (Appeal at 11.)  He testified that the fatal wound appeared to be from a rifle cartridge

9    from one of about a dozen common rifles, such as a 30-30, a 308 Winchester, or a 30-06, or one of a

10   couple of particular handguns that fire rifle cartridges.  (Id.)  He thought it would not take a great

11   deal of skill for the shooter in one moving car to hit the victim in another car.  (Id.)

12   Michael Peck, a sergeant with the San Mateo County Sheriff's office, testified in rebuttal as

13   an expert on firearms and ballistics.  (Appeal at 11.)  He stated that the difficulty of the shooting

14   would depend greatly on the type of weapon used.  (Id.)  A single-shot rifle would be more difficult;

15   a shotgun would have more room for error.  (Id.)  In this case, if the shooter used a scope, it is likely

16   that he aimed at the Victim's head, and the close range trajectory resulted in the wound being to the

17   neck.  (Id.)

18   Petitioner did not testify at trial.

19                              **III.  STANDARD OF REVIEW**

20   Petitioner filed his Petition in federal court on June 18, 2002, and filed his Amended Petition

21   on November 10, 2004.  Accordingly, this case is governed by the Antiterrorism and Effective Death

22   Penalty Act of 1996 ("AEDPA"), which imposes a "new constraint on the power of a federal habeas

23   court to grant a state prisoner's application for a writ of habeas corpus."  Williams v. Taylor, 529

24   U.S. 362, 412 (2000).  Under the AEDPA, a district court may entertain a petition for writ of habeas

25   corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the

26   ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

27   28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the

28

9

1    merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary

2    to, or involved an unreasonable application of, clearly established Federal law, as determined by the

3    Supreme Court of the Untied States; or (2) resulted in a decision that was based on an unreasonable

4    determination of the facts in light of the evidence presented in the State court proceeding."  28

5    U.S.C. § 2254(d).

6         A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for

7    purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis

8    of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a

9    procedural or other rule precluding state court review on the merits.  Barker v. Fleming, 423 F.3d

10   1085, 1092 (9th Cir. 2005); Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  Although an

11   evidentiary hearing might be evidence of an adjudication on the merits, it is a sufficient, rather than

12   a necessary, condition to AEDPA deference.  Id. at 970.

13        "Clearly established federal law, as determined by the Supreme Court of the United States"

14   refers to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of

15   the relevant state court decision."  Williams, 529 U.S. at 412; Lockyer v. Andrade, 538 U.S. 63, 71

16   (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-9 (9th Cir. 2001).  Section 2254(d)(1) "restricts the

17   source of clearly established law to the [Supreme] Court's jurisprudence."  Williams, 529 U.S. at

18   412.  When there is a Supreme Court case on point but without a majority opinion, the narrower

19   holding expressed by the concurring opinion controls and is "clearly established" law for purposes

20   of § 2254.  Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2856 (2007) (using standard from

21   Justice Powell's concurring opinion as clearly established law on the standard for procedures used to

22   evaluate a claim regarding a prisoner's competence to be executed).  The "holding" of a Supreme

23   Court's decision "necessarily refers not only to the result reached, but also the rationale necessary to

24   the reaching of that result."  Smith v. Patrick, 508 F.3d 1256, 1260 (9th Cir. 2007) (per curiam).  "A

25   federal court may not overrule a state court for simply holding a view different from its own, when

26   the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12,

27   17 (2003).

28                                          10

United States District Court

For the Northern District of California

A state court decision is "contrary to" clearly established Supreme Court precedent if it "'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (quoting Williams, 529 U.S. at 405-06); see, e.g., Andrade, 538 U.S. at 74 (state court decision not contrary to clearly established Supreme Court precedent where sentence of two consecutive 25-years-to-life terms and was not materially indistinguishable from an earlier Supreme Court case involving a sentence of life without parole and an earlier Supreme Court case involving a sentence of life with the possibility of parole). "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. The objectively unreasonable standard is not a clear error standard. See Andrade, 538 U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)). After Andrade, "[t]he writ may not issue simply because, in [the federal habeas court's] determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise." Id. at 75-76. While the "objectively unreasonable" standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than the [Ninth Circuit] ha[s] previously afforded them." Id. at 75.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

11

United States District Court

For the Northern District of California

1   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-

2   13; see, e.g., Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2859 (state court's unreasonable

3   application of Supreme Court's decision on procedure to evaluate claim of incompetency to be

4   executed made state court's adjudication of the actual incompetency claim an unreasonable

5   application; federal court then had to evaluate the claim without the deference otherwise required by

6   § 2254(d)); Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  The AEDPA requires a district

7   court to presume correct any determination of a factual issue made by a state court unless the

8   petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C.

9   § 2254(e)(1).  It is error for a federal court to review de novo a claim that was adjudicated on the

10  merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003) (reversing judgment of 6th

11  Circuit granting habeas relief on de novo review where claims did not meet standards for relief

12  under § 2254(d)(1)).  This presumption is not altered by the fact that the finding was made by a state

13  court of appeals, rather than by a state trial court.  See Sumner v. Mata, 449 U.S. 539, 546-47

14  (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150

15  (9th Cir. 2001).

16          Where, as in this writ, the California Supreme Court denies review of Petitioner's claim

17  without explanation, the Court looks to the last reasoned state court decision in conducting habeas

18  review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), cert.

19  denied, 354 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme

20  Court decision to the last reasoned state court decision).  The California Court of Appeal rendered

21  the last reasoned state court decision in Petitioner's case.

22          Habeas relief is warranted only if the constitutional error at issue is structural error or had a

23  "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson,

24  532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Under this

25  standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are

26  not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual"

27  prejudice.  Brecht, 507 U.S. at 637.

28                                                                  12

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  DISCUSSION

Petitioner raises three challenges to his conviction: (1) improper inclusion of evidence based on *Miranda* violations; (2) improper exclusion of evidence based on *Brady* violations; and (3) ineffective assistance of counsel.  The Court considers Petitioner's challenges in turn.

**A.**     ***Miranda* Violations**

**1.        August 12 Statement**

Petitioner contends that his Fifth, Sixth, and Fourteenth Amendment rights were violated when police continued questioning him on August 12, 1998, after he requested an attorney during custodial interrogation, and after he had been read his Miranda rights.  Petitioner claims that he did not re-initiate further communications with Archer and Colson, who were conducting the interrogation.  Therefore, the officers were not allowed to resume questioning without the presence of Petitioner's legal counsel.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence.  Miranda announced a constitutional rule that cannot be superseded legislatively.  See Dickerson v. United States, 530 U.S. 428, 431-32 (2000).  Miranda and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  See id. at 443-45.  The requirements of Miranda are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005); Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004).

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him.  See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); Taylor v. Maddox, 366 F.3d 992, 1014-15 (9th Cir. 2004) (advisement of Miranda warnings at beginning of interrogation of no consequence where petitioner requested to speak to attorney prior to start of questioning); Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir. 1999) (suspect's repeated questions about the immediate availability of an attorney constituted an unequivocal request for counsel).  Continued responses to questions from

United States District Court

For the Northern District of California

1  interrogators after a suspect invokes his right to have counsel present does not constitute a waiver of

2  the right.  See Alvarez, 185 F.3d at 998; Cheely, 21 F.3d at 922.

3     Authorities may continue the interrogation, however, if the accused himself voluntarily

4  initiates further communication.  See Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983); see, e.g.,

5  United States v. Jennings, 515 F.3d 980, 986 (9th Cir. 2008) (no Miranda violation where, during

6  transfer to federal custody, defendant initiated conversation about the crime after federal agents had

7  only identified themselves and asked if defendant had any personal property to retrieve); United

8  States v. Rodriguez-Lopez, 63 F.3d 892, 893 (9th Cir. 1995) (no Miranda violation where defendant

9  volunteered statement after he was apprised of Miranda rights and said he understood those rights).

10  Authorities may also continue the interrogation if the suspect does not clearly request an attorney.

11  See Davis v. United States, 512 U.S. 452, 459-62 (1994) (suspect must unambiguously request

12  counsel; "Maybe I should talk to a lawyer" insufficient); United States v. Younger, 398 F.3d 1179,

13  1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I am right, I can have a lawyer

14  present through all this, right?"does not constitute unambiguous invocation of right to counsel).

15     Statements made by suspects who are not in continuous custody between the time they

16  request counsel and the time they are reinterrogated are admissible.  See United States v. Coleman,

17  208 F.3d 786, 790-91 (9th Cir. 2000) (inculpatory statements during reinterrogation after suspect

18  had been released from custody for several days admissible).  A suspect-initiated confession may

19  also be constitutional even though it follows an earlier confession which violated Edwards.  See

20  Garvin v. Farmon, 258 F.3d 951, 957-58 (9th Cir. 2001) (finding state court conclusion that trial

21  court properly admitted suspect-initiated confession made three days after earlier confession that had

22  violated Edwards to be neither contrary to nor an unreasonable application of federal law).

23     Here, to support his position, Petitioner points to the fact that the trial judge properly ruled

24  that Petitioner's question about bail did not constitute a re-initiation of questioning, "because it

25  merely pertained to a routine incident of the custodial relationship." (Petition at 11.)  He then claims

26  that Archer's subsequent statements including, "Well, that's the way it is now," constituted not only

27

28                                                     14

**United States District Court**
For the Northern District of California

express questioning, but the functional equivalent of questioning, "because they were 'reasonably likely to elicit an [inculpatory or exculpatory] response' from Petitioner." (Id. at 9.)

The interrogation occurred on August 12, 1998, after Petitioner was arrested by Archer at Petitioner's home and read his Miranda rights. (Appeal at 12-14.)  At the police station, Petitioner was asked if he remembered the Miranda warning, or if he needed to have it re-read to him. Petitioner shook his head in acknowledgment.  Id.  Half way through the two-hour interview, Petitioner was informed that no bail had been set for him because he was in custody on a murder charge.  Petitioner began to cry softly and asked to call his wife.  After a few more questions, Petitioner said to the officers, "I don't mean to be rude to you people . . . I have to speak to an attorney."

Archer replied, "That's fine. Go ahead and get on the phone there.  You have an attorney you want to call?  Have him come on down."

Colson added, "Okay."

Petitioner then stated, "You said I'm not going to have no bail or nothing right?"

"Correct," Colson said.

Archer chimed in, "Well, that's the way it is now.  Unless things change . . . what you've told us now has only hurt your situation, you know.  You started to tell one story and, and it was going to be a story that put you in a better light and all of a sudden you can't tell that story cause, why I don't know.  Is it because it's not true or so I think you need to have your attorney get in touch with the D.A. and if there really is a truthful story that puts you in a less, lesser light, you need to share it pretty quick.  But do it through your attorney." (Appeal at 12-14.)

Petitioner then promised to talk to the officers later that night, after he spoke with his wife. Archer and Colson attempted to connect him with his wife, but were unable to do so.  While discussing how to return car keys to Petitioner's wife, Petitioner asked, "Can I ask you something, sir?"

Archer responded, "Sure."

"Did, did, ah, is it true what Sid said that, ah, the doctor, the wife . . .," Petitioner asked.

15

1    "Narked him off? Yeah, pretty much," Archer said.

2    "Really?" Petitioner replied.

3    "Yeah, she, she narked off, or narked off you and Sid both." Archer confirmed.

4    Petitioner responded, "See, I didn't even know her."

5    Archer added that Dr. Moalem was "beating on her and cheating on her," which made her

6    "up tight," so she talked to the district attorney about her husband and other names came to light.

7    Archer then noted that Sid talked to the police and since Sid did not pull the trigger Archer was

8    interested in what Sid had to say about who he hired and who did the shooting.

9    Petitioner then said, "You know who hired the people . . .? Moalem hired the people."

10   (Appeal at 12-14.)

11   The California Appellate Court held that Petitioner's request was an unambiguous request for

12   counsel.  It further held that "under Miranda and Edwards, [Petitioner] should not have been

13   subjected to further interrogation by the police until counsel was made available to him."  (Appeal at

14   15.)  However, it noted that the subsequent exchanges, including Petitioner's query regarding bail,

15   did not have the effect of eliciting an incriminating response, since Petitioner "immediately turned

16   his attention to telephoning his wife."  (Appeal at 16.)  It was at this point that Petitioner asked about

17   Tania and her involvement in the matter, about which the appellate court wrote, "The trial court

18   expressly held that this latter question constituted an initiation for further conversation within the

19   meaning of Edwards.  We agree . . . [Petitioner] reinitiated communication about Tania's informing

20   ('narking') on the conspirators, and followed with discussion of the fact that Dr. Moalem hired the

21   driver and shooter.  Thus, [Petitioner] clearly initiated discussion relating directly to the

22   investigation."  (Id.)

23   Upon review the record, the Court does not find that the Appellate Court's decision was

24   unreasonable in light of the facts of Petitioner's case.  Accordingly, Petitioner has failed to establish

25   that he is entitled to habeas relief on the basis of a Miranda violation claim due to his own initiation

26   of communication that opened up further questioning.

27

28
                                        16

United States District Court
For the Northern District of California

**2.**      **Waiver of Rights to an Attorney and to Remain Silent**

Petitioner contends his waiver of counsel was void and involuntary, in violation of his Fifth, Sixth, and Fourteenth Amendment rights to freedom of self-incrimination, and counsel.  Petitioner claims that Archer's statements during the first interrogation were misleading and caused Petitioner to involuntarily waive his Miranda rights.

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).[6]  The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect.  Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999).  Absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. Colorado v. Connelly, 479 U.S. 157, 167 (1986); Norman v. Ducharme, 871 F.2d 1483, 1487 (9th Cir. 1989), cert. denied, 494 U.S. 1031, and cert. denied, 494 U.S. 1061 (1990).

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant.  Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)); see, e.g., Cunningham v. Perez, 345 F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to give break for food and water, officer suggested cooperation could lead to treatment rather than prison, officer made statement he had put people in prison for similar conduct, officer denied plaintiff's request to call

---

[6] Involuntary confessions are inadmissible for any purpose, including impeachment.  See Henry v. Kernan, 197 F.3d 1021, 1028 (9th Cir. 1999).  Statements taken in violation of Miranda, on the other hand, may be used to impeach the defendant's credibility even though they are inadmissible as evidence of guilt and are limited to collateral matters.  See Harris v. New York, 401 U.S. 222, 225 (1971).

United States District Court

For the Northern District of California

therapist, and plaintiff diagnosed with mental disorder and taking bi-polar medication); Pollard v. Galaza, 290 F.3d 1030, 1035-36 (9th Cir. 2002) (no coercion found in police questioning that violated Miranda because the defendant initiated the conversation by asking "What happened?," he showed no signs of physical discomfort, and the physical environment was not excessively uncomfortable). Further, encouraging a suspect to tell the truth is not coercion. Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997). Nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer. United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003).

Voluntariness of a confession is not a factual issue entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent consideration in a federal habeas corpus proceeding. Miller v. Fenton, 474 U.S. at 116; Collazo v. Estelle, 940 F.2d 411, 415 (9th Cir. 1991) (*en banc*) (federal court not bound by state court finding that confession is voluntary), cert. denied, 502 U.S. 1031 (1992). A federal habeas court must review de novo the state court's finding that a confession was voluntarily given. Derrick v. Peterson, 924 F.2d at 818. But a state court's subsidiary factual conclusions are entitled to the presumption of correctness. Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996) (deferring to state appellate court's conclusion that challenged statement did not constitute threat or promise).[7]

The erroneous admission of a coerced confession is subject to harmless error analysis. Fulminante v. Arizona, 499 U.S. 279, 306-12 (1991). In other words, habeas relief is appropriate only if the coerced confession had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Pope v. Zenon, 69 F.3d 1018, 1025 (9th Cir. 1995) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, a review of the record by the Court shows that Petitioner's statements were voluntary, knowing and intelligent. After Petitioner requested counsel he was offered a phone, if he chose to call counsel of his own. He had already been read his Miranda rights, which he acknowledged

---

[7] The cases cited regarding habeas standards of review were decided prior to enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996.

1  understanding, so he had been informed that counsel would be provided for him were he not able to

2  afford one.  He was repeatedly told that if he had a story to tell that would present him in a better-

3  light he needed to have that story told by his attorney.  Not until after a discussion regarding how to

4  return car keys to Petitioner's wife did Petitioner re-initiated communication.  In light of the totality

5  of the circumstances noted in a review of the record, Petitioner's will was not overborne by physical,

6  psychological coercion or improper inducements.

7       Thus, the Court finds that the Appellate Court's decision was not "objectively unreasonable."

8  Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis that his

9  statements were not knowing, intelligent and voluntary.

10      **3.     Subsequent Statements**

11      Petitioner contends that his August 13 and August 14, 1998, statements to the police should

12  be excluded due to the alleged police coercion used to obtain them.  He claims that these inculpatory

13  statements were the fruit of the August 12, 1998, custodial interrogation which rendered an

14  involuntary confession.  He further contends that these two statements were the product of improper

15  inducements and misinformation on the part of the interrogating officers.

16      Police generally may offer to tell the prosecutor about the defendant's cooperation and

17  suggest that cooperation may increase the likelihood of a more lenient sentence.  See  United States

18  v. Willard, 919 F.2d 606, 608 (9th Cir. 1990), cert. denied, 502 U.S. 872 (1991); Guerrero, 847 F.2d

19  at 1366.  However, "threatening to tell the prosecutor of a suspect's refusal to cooperate violates . . .

20  [a defendant's] fifth amendment right to remain silent."  Id. at 1366 n.5; see United States v. Tingle,

21  658 F.2d 1332, 1336 n.5 (9th Cir. 1981).  There are "no circumstances under which law enforcement

22  officers may suggest that a suspect's exercise of the right to remain silent may result in harsher

23  treatment by a court or prosecutor."  United States v. Harrison, 34 F.3d 886, 891-92 (9th Cir. 1994)

24  (emphasis in original).

25      Here, Petitioner was read his Miranda rights, which he acknowledged, before both the

26  August 13 and August 14, 1998, interrogations.  In those interrogations, he voluntarily told his

27  version of events.  With regard to the August 13, 1998, interrogation, Petitioner claims that his

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   statements should be excluded because (1) Archer coerced him into waiving his right to counsel, and

2   (2) that the statement was the tainted fruit of the first, illegally obtained statement.

3          However, a review of the record fails to show by clear and convincing evidence that Archer

4   told Petitioner that he would be better off waiving his right to legal counsel and talking to the police.

5   Rather, Archer told Petitioner repeatedly that if he wanted an attorney he was welcome to one.

6   Further, Archer reminded Petitioner that he had been read his rights. And, as noted supra, the first

7   confession was not tainted, therefore any statements flowing from that interrogation do not fall

8   under the fruit of the poisonous tree doctrine.

9          With regard to the August 14, 1998, interrogation, Petitioner claims that Archer misadvised

10  him when he could see or talk to an attorney. Yet, Petitioner acknowledges that his Miranda rights

11  were read to him. Petitioner was well aware that an attorney could have been provided for him, if he

12  could not afford one. The fact that an attorney would also have been provided at arraignment did

13  not negate that Miranda right.

14         Thus, the Court finds that the Appellate Court's decision was not objectively unreasonable.

15  Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis of his

16  claim that the August 13, 1998, and August 14, 1998, statements were involuntary and fruits of the

17  August 12, 1998, interrogation. Further, Petitioner has failed to establish that he is entitled to habeas

18  relief on the basis that these two statements were the product of improper inducements and

19  misinformation on the part of the interrogating officers.

20         **4.     Agan's Testimony**

21         Finally, Petitioner contends that but for his naming of Agan as the get-away driver in the

22  murder of Dr. Hurwitz, Archer and Colson would never have interviewed Agan and Agan's

23  testimony would not have fallen under the "inevitable discovery" doctrine. Instead, Agan turned

24  state's evidence and testified against Petitioner.

25         The "fruit of the poisonous tree" doctrine does not operate in the Miranda context in the

26  same way that it does in the Fourth Amendment context. United States v. Patane, 124 S. Ct. 2620,

27  2626 (2004); Missouri v. Seibert 124 S. Ct. 2601, 2609-2611 (2004) (plurality opinion) (issue in

28                                                     20

"question first, warn later" procedure, in which police obtain confession without giving <u>Miranda</u> warning, then give warning and obtain confirmation, is whether <u>Miranda</u> warning could function effectively; if warning could not place suspect in position to make informed choice, such mid-stream warnings cannot be accepted as compliance with <u>Miranda</u>); <u>Oregon v. Elstad</u>, 470 U.S. 298, 306 (1985); <u>United States v. Orso</u>, 266 F.3d 1030, 1034-35 (9th Cir. 2001) (*en banc*); <u>see, e.g.</u>, <u>United States v. Polanco</u>, 93 F.3d 555, 560 (9th Cir. 1996) (<u>Mirandized</u> statement that follows earlier non-<u>Mirandized</u> statement not inadmissible as "fruit of poisonous tree" if initial statement was voluntary and later statement was made knowingly and voluntarily); <u>United States v. Sandoval</u>, 894 F.2d 1043, 1047-48 (9th Cir. 1990) (non-testimonial physical evidence discovered as result of statements obtained in violation of <u>Miranda</u> not inadmissible as "fruit of poisonous tree" where statements were not involuntary and due process was not violated).[8]

Since the Court has found that Petitioner's first statement was not illegally obtained, the subsequent statements, including Agan's, are not fruit of the poisonous tree. <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 487 (1963). In light of this finding, the Court also finds that there was no cumulative error in the admission of Petitioner's three statements and Agan's testimony.

## B.   <u>*Brady* Violation</u>

Petitioner contends that the Prosecutor's failure to inform him that the police paid money to witnesses Agan and Jimmy Browne violated his Fifth and Sixth Amendment rights. He further claims that the Prosecutor failed to disclose two written plea agreements with Agan dated February 8 and February 18, 1999. Petitioner claims that the failure to disclose such impeachment evidence constitutes misconduct because a witness' credibility depends heavily on his motives for testifying.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

---

[8] A post-arrest/post-Miranda waiver of <u>Miranda</u> rights will not act to waive and make admissible comment about a defendant's post-arrest/pre-<u>Miranda</u> silence. <u>See</u> <u>United States v. Velarde-Gomez</u>, 269 F.3d 1023, 1034 (9th Cir. 2001).

**United States District Court**
For the Northern District of California

1   prosecution." Id. at 87.  The Supreme Court has since made clear that the duty to disclose such

2   evidence applies even when there has been no request by the accused, United States v. Agurs, 427

3   U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory

4   evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).  Evidence is material "if there is a

5   reasonable probability that, had the evidence been disclosed to the defense, the result of the

6   proceeding would have been different.  A 'reasonable probability' is a probability sufficient to

7   undermine confidence in the outcome." Id. at 682.

8       "There are three components of a true Brady violation: [t]he evidence at issue must be

9   favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence

10  must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

11  ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  The evidence need not be sufficient to

12  affirmatively prove the defendant innocent; it need only be favorable and material.  Gantt v. Roe,

13  389 F.3d 908, 912 (9th Cir. 2004).  Brady has no good faith or inadvertence defense; whether

14  nondisclosure was negligent or by design, it is the responsibility of the prosecutor.  Id.  That the

15  defense failed to discover favorable evidence when it could or should have done so does not mean

16  that such evidence has not been "suppressed." Id. at 912-13.

17      Prejudice will be found if the suppressed evidence was "material" under state law to the

18  accused's guilt or punishment.  Anderson v. Calderon, 232 F.3d 1053, 1062, 1066 (9th Cir. 2000) (to

19  decide whether undisclosed information was favorable and material, federal habeas court looks to

20  controlling state law).  Materiality is defined in terms of suppressed evidence considered

21  collectively, not item by item.  Kyles v. Whitley, 514 U.S. 419, 436 (1995); Barker v. Fleming, 423

22  F.3d 1085, 1099 (9th Cir. 2005); Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).

23  The state does not satisfy its Brady obligation by disclosing some evidence and asserting that the

24  rest would be cumulative; all material information must be disclosed.  Benn v. Lambert, 283 F.3d

25  1040, 1057-58 (9th Cir. 2002) (internal quotation marks omitted).

26      Impeachment evidence is exculpatory evidence within the meaning of Brady.  See Giglio v.

27  United States, 405 U.S. 150, 154 (1972); Bagley, 473 U.S. at 676; United States v. Bracy, 67 F.3d at

28                                          22

1428.  "Brady information includes 'material . . . that bears on the credibility of a significant witness

in the case.'"  United States v. Brumel-Alvarez, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting

United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988), cert. denied, 489 U.S. 1032 (1989)).

The duty to disclose evidence of favorable treatment of a prosecution witness is not limited to

charges that were dismissed as an express term of a plea agreement or in consideration for the

witness's testimony.  Belmontes v. Brown, 414 F.3d 1094, 1113 (9th Cir. 2005) (evidence that

traffic violations were dismissed against witness after prosecutor intervened should have been

disclosed to defense, even though this favorable treatment was not promised in plea agreement);

Killian v. Poole, 282 F.3d 1204, 1210 (9th Cir. 2002) (conviction reversed where undisclosed letters

would have been valuable to the defense in impeaching "make-or-break" witness' credibility before

the jury); Paradis v. Arave, 240 F.3d 1169, 1177-78 (9th Cir. 2001) (district court did not err in

granting writ of habeas corpus when record supported conclusion that there is a reasonable

probability that the result of petitioner's trial would have been different if prosecution had disclosed

to the defense handwritten notes that would have been valuable impeachment evidence of key

prosecution witness); United States v. Service Deli Inc., 151 F.3d 938, 943-44 (9th Cir. 1998)

(conviction reversed because government failed to disclose handwritten notes containing

information that could have led to three avenues of impeachment of witness on whose testimony

government's entire case rested); Singh v. Prunty, 142 F.3d 1157, 1161-63 (9th Cir. 1998)

(petitioner entitled to habeas relief where prosecution suppressed evidence of agreement to provide

benefits to key witness in exchange for his testimony, and reasonable probability existed that had

evidence been disclosed one or more members of jury would have viewed the testimony differently).

     The fact that the defense already has some evidence with which to impeach a prosecution

witness does not excuse the prosecution from disclosing further impeachment evidence which

"'would provide the defense with a new and different ground of impeachment.'"  Silva v. Brown,

416 F.3d 980, 989-90 (9th Cir. 2005) (citation omitted) (habeas granted based on failure to disclose

provision in deal between prosecution and witness excusing witness from psychiatric exam which

would have exposed witness's incompetence).

United States District Court

For the Northern District of California

Here, the prosecutor acknowledged that the expenses probably should have been disclosed, but argued there was no prejudice to the defense because the money was used solely to protect a witness for a short period before he was taken into custody.   (RT 8/30/99 at 49-50.)   The trial court was the only court to rule on this issue, and it agreed with the prosecution that there was no prejudice and therefore no due process violation.   The court held:

> The Court has considered all the motions in this matter.  At this point, as to the latter issue having to do with the compensation or payment of housing and other incidental expenses, to characterize the motel as a jail I think, frankly, belittles the argument and I don't think it's very persuasive.
>
> However, there is a danger, Mr. Horngrad [defense counsel], to be exploring with Mr. Agan the issue of why or the underlying circumstances of the payments in a hotel, or rather motel payments, and any other expenses if in fact it was done for purposes of the safety of a witness, because that could raise other issues that might blow up in the face of Mr. Quilopras.
>
> Nevertheless, this Court finds that that information, at least as to paying for housing, not the specific place, paying for phone calls, paying for meals should have been disclosed to the defendant's attorney for purposes of them making a decision whether as trial tactics that should be explored or not.
>
> This Court finds that that information was known or should have been known by the People and should have been revealed to the defendant as a mater of Brady information.  However, in the big picture, in terms of its effect or absence of providing that information, it seems to me that it really is small in comparison to all the other benefits Mr. Agan had received.
>
> I don't find that it prejudiced the defendant in any stretch of the imagination.  You had the most persuasive evidence for purposes of impeaching Mr. Agan; namely, his plea bargain and the fact that he was getting a fixed 15-year term for his involvement in two homicides, apparently, although I don't know to what extent Mr. Agan's involvement was in the homicide in South San Francisco, which we are dealing with in an unrelated, or, if you wish, related proceeding going on right now.
>
> But certainly by being the driver knowing full well that he was going to assist in the assassination and killing of Hurwitz is certainly the most compelling evidence to get a deal, and I think that the small compensation, relatively speaking, is not very persuasive.
>
> And as a result and on that ground, I'm going to deny the motion for new trial.  I don't find it to be prejudicial to the defendant that that wasn't provided, but it should have been.

(RT 8/30/99 at 52-53.)

Since the prosecutor admitted that the evidence was withheld, the Court will not further explore the first Brady factor.  The state court found the evidence to be admissible impeachment

United States District Court

For the Northern District of California

1  evidence against Agan.  Thus, the Court finds that the record supports the first two prongs of <u>Brady</u>

2  violation requirements.

3        The remaining prong is whether the evidence was prejudicial by a showing that the outcome

4  of the trial would have been different with its inclusion.  <u>Strickler</u>, 527 U.S. at 281-82.  The state

5  court found that the disclosed benefits given to Agan and the other impeachment evidence were

6  more convincing than the fact that Agan was given money to live while he was testifying.  The state

7  court pointed specifically to the facts that Agan agreed to drive for a known killing, Agan sold and

8  used drugs with Petitioner, and that Agan received a fixed fifteen-year sentence for his roles in the

9  murder of Dr. Hurwitz and another unrelated murder.  Petitioner also concedes that there is a very

10  strong case against Petitioner because of Petitioner's statements.  Since Petitioner's statements were

11  taken legally, even if Agan was impeached as a witness, it would not have had any effect on the trial

12  if this evidence had been available.  Thus, in light of the impeachment evidence available to

13  Petitioner, the amount of money provided to or spent on Agan was insufficient to overcome the

14  admissions of murder by Petitioner during his custodial interrogations.

15        The Court finds that there was no prejudice in the suppression of this evidence and thus no

16  <u>Brady</u> violation.  Accordingly, Petitioner is not entitled to habeas relief on his due process claim.

17  **C.**      **<u>Ineffective Assistance of Counsel</u>**

18        Petitioner contends that the failure of his trial counsel, Douglas Horngrad, to obtain evidence

19  not disclosed by the prosecution constituted ineffective assistance of counsel.  The evidence he

20  alludes to includes information that the police used Jimmy Browne to persuade Agan to testify as a

21  prosecution witness; that the police used Jimmy Browne to feed information to Agan, enabling Agan

22  to falsely create and embellish his testimony; that the police paid money to Jimmy Browne; and that

23  the prosecution failed to disclose two written plea agreements with Agan and his lawyer.

24        A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

25  Amendment right to counsel, which guarantees not only assistance, but effective assistance of

26  counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  The benchmark for judging any

27  claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

28  25

the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  See Taylor, 529 U.S. at 404-08 (2000).

Here, Petitioner claims that "if, arguendo, any of this undisclosed evidence was available to trial counsel Douglas Horngrad, and if he negligently failed to seek out and obtain any such available evidence, or to conduct appropriate investigation therefor, then said failure constituted ineffective assistance of counsel."  (Petition at 34.)  Nowhere does Petitioner show this Court that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Without more, Petitioner cannot show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  Petitioner has not shown prejudice under the Strickland standard.

Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis of ineffective assistance of counsel.

# V. CONCLUSION

The Court finds that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the Petition for Writ of Habeas Corpus is DENIED.  Judgment shall be entered accordingly.

Dated: September 30, 2009

JAMES WARE
United States District Judge

**United States District Court**
For the Northern District of California

1    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2    Alison Minet Adams shark@rain.org
     Christopher William Grove christopher.grove@doj.ca.gov
3    Gerald August Engler Gerald.Engler@doj.ca.gov
     Morris Beatus morris.beatus@doj.ca.gov
4

5    **Dated: September 30, 2009**                    **Richard W. Wieking, Clerk**

6
                                                     **By:____/s/ JW Chambers_____**
7                                                        **Elizabeth Garcia**
                                                         **Courtroom Deputy**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          28